The JICARILLA APACHE TRIBE, Plaintiff,

v.

SUPRON ENERGY CORPORATION et al., Defendants.

No. 75–247–M Civil.

United States District Court, D. New Mexico.

Nov. 5, 1979.

---

Nordhaus, Moses & Dunn, Robert J. Nordhaus, B. Reid Haltom, Peter E. Springer, Albuquerque, N.M., for plaintiff.

Campbell & Black, P.A., Bruce D. Black, Santa Fe, N.M., for Supron Energy Corp.

Modrall, Sperling, Roehl, Harris & Sisk, John R. Cooney, Peter J. Adang, Susan R. Stockstill, Albuquerque, N.M., for Southland Royalty Co.

Hinkle, Cox, Eaton, Coffield & Hensley, Harold L. Hensley, Jr., J. Douglas Foster, Roswell, N.M., Baker & Botts, Frank G. Harmon, Houston, Tex., for Exxon Co., U.S.A.

R. E. Thompson, U.S. Atty., James B. Grant, Raymond Hamilton, Special Asst. U.S. Attys., Albuquerque, N.M., for Cecil Andrus, Secretary of Interior.

Montgomery, Andrews & Hannahs, P.A., Gary R. Kilpatric, Santa Fe, N.M., for third-party defendant Gas Company of New Mexico.

## MEMORANDUM OPINION

MECHEM, District Judge.

There having been a bench trial on the merits in this action in May and June, 1979, the following shall constitute my Findings of Fact and Conclusions of Law, pursuant to Rule 52 of the Federal Rules of Civil Procedure.

Plaintiff, The Jicarilla Apache Tribe (Tribe), in its Second Amended Complaint seeks treble damages based on alleged antitrust violations as well as damages and an accounting based on alleged breaches of the several leases which are the subject matter of this litigation. Defendants to these claims are Supron Energy Corporation, formerly Southern Union Production Company (Supron), Southland Royalty Company, formerly Aztec Oil and Gas Company (Southland or Aztec), and Exxon Company, U.S.A., formerly Humble Refining Company (Exxon). Not all of plaintiff's several claims are lodged against each of these defendants-lessees, as is more fully set out below.

Gas Company of New Mexico, formerly Southern Union Gas Company (GCNM or SUG), and Southern Union Gathering Company (SUGC), both wholly owned subsidiaries of Southern Union Company (Southern Union), originally were named defendants to this action. GCNM and SUGC effected a settlement agreement with the Tribe in late 1976. GCNM remains a third-party defendant to this action by virtue of a cross-claim lodged by Southland alleging a claim of indemnity under the gas purchase contract effected between these two companies for excess royalties Southland may be found to owe the Tribe.

Also a named defendant is Cecil Andrus, Secretary of the Interior (Secretary), by virtue of the Tribe's claim that the Secretary has breached his fiduciary obligation to the Tribe arising under provisions of the several leases which are the subject matter of this litigation. As to the defendant Secretary, the Tribe seeks declaratory judgment that the alleged breach of fiduciary duty in fact occurred as well as an account-

ing for royalties allegedly owing by defendants-lessees which the Secretary and his named representatives have failed to secure for the Tribe under the leases in question.

Plaintiff, at the trial on the merits in this action, moved to conform its pleadings to the evidence, which motion was granted. Accordingly, issues raised at trial which were not set out in plaintiff's Second Amended Complaint will be considered in addition to the issues raised therein. Plaintiff's claims have been at times as the shifting sands. Any issues plaintiff claims to have raised which are not considered in this Opinion are deemed to have fallen of their own weight or lack thereof.

Plaintiff is an Indian Tribe organized and incorporated under the laws of the United States of America, 25 U.S.C. 476–7, residing on an Executive Order Reservation in Rio Arriba and Sandoval Counties in Northern New Mexico. Defendants Supron, Southland and Exxon are foreign corporations qualified to do business or doing business in New Mexico who have their principal places of business outside the State of New Mexico. Subject matter jurisdiction is proper pursuant to 28 U.S.C. 1331(a) and 1362, 5 U.S.C. 701–06 and 15 U.S.C. 15.

Defendant Supron, whose name was changed from Southern Union Production Company in April, 1977 by action of its stockholders, was originally an inactive corporation which was a wholly owned subsidiary of Southern Union. Southern Union's ownership of Supron's stock was reduced to approximately 70% in the early 1970's and further reduced to approximately 28% in December of 1976. Defendant Southland acquired Aztec by merger subsequent to the filing of the original complaint in this action in which Aztec was a named defendant. Southland succeeded to this litigation by virtue of the merger. Aztec was originally organized in 1950 as a wholly owned subsidiary corporation of Southern Union and was subsequently spun off in 1954. SUGC was organized as a wholly owned subsidiary of Southern Union in 1953 and remains such to date.

From the year 1950 to the present, the Tribe has been lessor and royalty-interest owner of oil and gas leases approved by the Secretary of the Interior on the Tribe's Reservation lands in the San Juan Basin. The leases which are the subject of this litigation are Jicarilla Lease Nos. 10, 47, 100, 101, 103–107, 145, 150, 153, 397 and 416–18. In 1950, SUG became the original lessee of leases numbered 10, 100, 101, 103 through 107, 145, 150 and 153. On May 20, 1952, SUG assigned separate undivided one-half interests in leases 104 and 107 to Humble Oil Company (Exxon). On January 1, 1956, Exxon contracted to sell natural gas produced from leases 104 and 107 to SUG. Sales of natural gas continue to be made pursuant to this contract, as amended, to date. Exxon assigned its undivided one-half interest in lease 107 to Billy J. Knott effective February 9, 1973, reserving all leasehold rights below the base of the Dakota formation. Exxon's conveyance to Knott was approved by the Bureau of Indian Affairs (BIA) in May of 1979, effective retroactive to the date of conveyance.

On January 1, 1955, SUG assigned separate undivided one-half interests in leases 100, 101, 103, 105, 106, 145, 150 and 153 to Aztec, at that time a wholly owned subsidiary company of SUG. Aztec acquired leases numbered 397 and 416 through competitive lease sales in 1966 and 1969 respectively. Aztec and Southland have sold natural gas produced from their leases to SUG pursuant to a gas purchase contract executed December 12, 1953, as amended. On January 1, 1961, SUG assigned its rights in leases 10 and 47 and separate undivided one-half interests in leases 100, 101, 103–107, 145, 150 and 153 to Supron, at that time a wholly owned subsidiary of SUG. On that same date, Supron executed a gas purchase contract with SUG for sale of natural gas from the leases assigned to it. Two additional gas sales contracts were executed between Supron and SUG regarding sales from additional properties previously owned by SUG assigned to Supron. Supron acquired leases 417 and 418 through competitive lease sales in May of 1969. Numerous additional gas contracts have been evi-

denced throughout these proceedings but need not be particularly delineated here. Suffice it to say that the numerous dealings between and among the defendant energy companies and others have been commensurate with the complexities generally associated with the oil and gas industry.

The contractual relations of the Tribe and defendants-lessees are governed by the provisions of Standard Lease Form 157 entered into on behalf of the Tribe by the Secretary pursuant to federal statutes, 25 U.S.C. § 396a et seq., and federal regulations, 25 CFR Part 171 and 30 CFR Part 221. Under the terms of the lease and the applicable federal statutes and regulations, the Secretary has the duty and the jurisdiction to determine whether lessees are performing according to the terms and conditions of leases on Indian lands and to determine the "value" of any minerals produced for purposes of computing royalties to be paid by the lessees.

Prior to its institution of this action, the Tribe demanded in 1973 that the Secretary take appropriate and necessary action to make determinations required of him under the terms of the lease and to require lessees to perform their obligations as denominated in the lease provisions. The Tribe has continued to demand action of the Secretary since 1973. When it became clear to the Tribe that, in its opinion, its demands would not be heeded by the Secretary, it instituted this action in 1975. In addition to its demands on the Secretary, the Tribe has previously demanded of defendants-lessees that they pay royalties on gas produced based on the actual value of such gas, that they account separately for liquid hydrocarbon substances as required by the lease terms, that they drill such offset wells as are necessary to protect lease lands from drainage, and that they exercise reasonable diligence in the development of oil and gas, while products can be secured in paying quantities, of leases held by these lessees on Reservation lands. The Secretary has assigned responsibility for the leases in question to the Area Oil and Gas Supervisor of the United States Geological Survey (USGS) who has been stationed at various times in Roswell and Albuquerque, New Mexico and Durango, Colorado.

## THE TRIBE'S ANTITRUST CLAIMS

The Tribe's antitrust claims are several. It claims Supron monopolized the market for liquid hydrocarbons in restraint of trade and in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, in light of Supron's operation of the Lybrook Gasoline Extraction Plant from 1971 to 1976. It claims that the contract agreement entered into between Supron and SUG unlawfully fixed the price of liquid hydrocarbons in restraint of trade; that Southland and SUG unlawfully fixed the price of natural gas pursuant to gas purchase contracts effected between them on December 31, 1953 and January 2, 1954; that Supron and SUG unlawfully fixed the price of natural gas in restraint of trade pursuant to the gas purchase agreement effected between them on January 1, 1961; that Supron, SUG and SUGC fraudulently concealed from the USGS and the Tribe the amount of actual revenues received for gas and associated liquid hydrocarbons produced therefrom, which concealment amounted to a conspiracy in restraint of trade and in violation of the Antitrust Acts; that Supron, Southland and Exxon conspired to fraudulently fail to accurately account for liquid hydrocarbons between 1973 and 1975 as required by the terms of the leases; and that Supron and Southland and Supron and Exxon respectively conspired in restraint of trade in 1975 and 1976 by failing to diligently develop the leases or drill offset wells required by the terms of the leases and in fraudulently concealing from the USGS and the Tribe the development potential of the leases in order to hold the properties which were the subject of the leases for speculation.

Plaintiff further directs a claim of conspiracy in restraint of trade against Supron and SUG in that these defendants prevented the Tribe from taking its royalty gas in kind as provided under the terms of the leases. An additional claim of conspiracy to fix prices is lodged against SUG, SUGC and

Supron based on their June, 1976 settlement agreements which resulted in the dismissal with prejudice of State Court cases brought in Texas and New Mexico concerning the price to be paid for natural gas produced from leases on the Reservation. Finally, plaintiff claims that at various times until 1976, defendants Supron, SUGC, SUG and Aztec, violated Section 8 of the Clayton Antitrust Act, 15 U.S.C. § 19, which prohibits interlocking directorates of competing companies when the potential for antitrust violations by those companies exists.[1]

■ Subject matter jurisdiction over antitrust claims resides in a federal District Court on a finding that the activities which form the basis for alleged antitrust violations are in or affect interstate commerce. *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). In my Memorandum Opinion dated April 13, 1979, I concluded, in denying defendants' motions for summary judgment, that plaintiff had made sufficient showing of the required nexus between interstate commerce and the acts forming the basis of the alleged antitrust claims to withstand defendants' motions for summary judgment. I conclude from facts adduced at trial that the activities of defendants which form the basis for plaintiff's antitrust claims sufficiently affect interstate commerce to provide subject matter jurisdiction over plaintiff's antitrust claims. I find further from facts adduced at trial that the Tribe is a natural gas producer and therefore a competitor in the sale of natural gas.

The relevant geographical market in which to view plaintiff's antitrust claims is the San Juan Basin of Northern New Mexico, a discrete oil and gas producing region. The relevant product which is the subject of plaintiff's antitrust claims is natural gas, including natural gas sold intrastate and interstate. As to plaintiff's claim of monopoly regarding the operation of the Lybrook plant, the relevant market is liquid hydrocarbons processed from natural gas marketed both intra- and interstate.

■ Plaintiff's claim of monopoly may be dispensed with briefly. Quite simply, the Tribe has failed to adduce proof sufficient to sustain a claim of monopoly. Whether the relevant market is intrastate or interstate sales of liquid hydrocarbons, neither Supron nor SUG ever marketed more than 50% of the liquid hydrocarbons sold in the San Juan Basin. Having never acquired more than one-half of the relevant market in liquid hydrocarbons in the San Juan Basin, neither Supron nor SUG, as a matter of law, ever acquired a large enough proportion of the market to sustain plaintiff's claim of monopoly. *Continental Baking Co. v. Old Homestead Bread Co.*, 476 F.2d 97, 104 (10th Cir.), cert. den., 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218 (1973); *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir. 1945). The Tribe's claim of monopoly violation will be dismissed with prejudice.

■ The Tribe's claim of conspiracy in restraint of trade to prevent it from taking its royalty gas in kind may be dismissed in terms equally brief. The leases at issue in this action expressly require the Tribe to give thirty days written notice of its intent to take royalty gas in kind. Standard Lease Form 157, ¶ 4(c). The Tribe presented no evidence that at any time it presented adequate notice to its lessees to take its royalty gas in kind. Whether the Tribe thought it could take its gas in kind or whether lessees would have acquiesced to such a demand from the Tribe is immaterial in the absence of the required written notice. Additionally, defendants were under no affirmative obligation to indicate to the Tribe whether they believed that contractual obligations with third parties prevented the Tribe from taking its royalty gas in kind. Absent a formal request from the Tribe, defendants had no such affirmative obligation.

1. Plaintiff's belated claim of price discrimination in violation of Section 2 of the Clayton Act, 15 U.S.C. § 13, was raised and withdrawn, both after trial on the merits.

■ Plaintiff's further claim of conspiracy in restraint of trade to limit development of the leases and to fraudulently conceal the potential of the leases fails in light of substantial evidence that defendants-lessees acted and informed the USGS of their intentions when requested to do so based on sound, if conservative, business decisions. Several of the leases in issue involved interests held jointly by lessees. That joint lessees might have communicated between themselves regarding decisions concerning development and potential of the leases necessarily followed from the jointly held rights and concomitant obligations of joint lessees. I find in the record no evidence of any concerted agreements among lessees to defraud or conceal from the USGS and the Tribe information regarding the leases or lessees' intentions concerning the leases.

Lessees' responses to USGS inquiries regarding development and potential of the leases were at all times honest, if not unequivocal. That joint lessees considered carefully the content of their responses to USGS inquiries resulted not from conspiratorial intent but rather from the real or apparent fear that incorrect or insufficient responses would place their valuable leaseholds in jeopardy. Defendants cannot be faulted for responding as they did. Whether or not they may have agreed with the USGS' position regarding their leases, defendants felt obliged to grant the USGS some degree of deference in order to protect their leasehold interests.

■ Plaintiff's claims of conspiracies to fix prices and to limit development of the leases based on the gas purchase contracts entered into by defendants is similarly unpersuasive. Substantial evidence at trial revealed that the long-term contracts executed in the San Juan Basin had been the order of business since the 1930's. Life of the lease contracts and long-term twenty-year contracts were deemed required by both purchasers and buyers of natural gas in the San Juan Basin. Buyers found them necessary because of the substantial commitment required to develop production and transportation facilities sufficient to service wells in remote areas of Northern New Mexico and sellers because of the need to insure a constant, stable market for their production even, as in later years, when wells became substantially depleted and thereby less valuable producers. The comparable terms and prices set in these contracts reflect not illegal conspiracies but rather the considered judgment of the parties to these contracts that such prevailing terms and prices, at the time these contracts were consummated, were fair and reasonable to all parties.[2]

Similarly, the presence of favored nation clauses [3] in the gas purchase contracts under attack are incompatible with a conclusion that there existed conspiracies to fix prices and restrain trade. To the contrary, favored nation clauses insured that higher prices received by other sellers as a result of subsequent contracts would be afforded to signatories to the earlier contracts. The favored nation clauses guaranteed a continuing escalation of prices received by lessees and thereby increased royalties received by the lessor, contrary to any claim that a conspiracy existed to fix prices below market value in the Basin. The Tribe's claim that SUG was able to avoid triggering these favored nation clauses by calling on gas reserves it controlled in other markets points not to conspiracy but to business maneuvering of which SUG was able to take advantage in order to deliver its prod-

2. While evidence revealed that SUG tended to negotiate gas purchase contracts on a "take it or leave it" basis with regard to prices dictated by it, this at best tends to reveal monopolistic activities attributable not to defendants-lessees, but to SUG, who has bought its peace in this lawsuit. This apparently illegal activity on the part of SUG cannot be imputed to the defendants remaining in this action.

3. The favored nation clause (also known as a most favored nation clause or price equalization clause) provides that the seller will receive a price for gas produced no less than that paid by the buyer to any other natural gas producer in the Basin for natural gas delivered under similar conditions, quality, volume and pressure.

uct to its customers at the lowest possible price. In any event, SUG was not able uniformly to avoid price escalations due to favored nation clauses. These clauses were triggered from time to time.

Testimony at trial established that the natural gas purchase contracts attacked by the Tribe were "typical wellhead gas purchase contracts," as was a contract effected between the Tribe and SUGC in December, 1976. The Tribe received an identical price for its natural gas in its 1976 gas purchase contract, which contract included identical escalation clauses to those found in the several purchase contracts under attack. Evidence at trial also indicated that low prices for natural gas in the 1970's resulted in part from federal regulations concerning interstate gas prices and actions taken by the New Mexico Public Service Commission.

The Tribe also claims that SUG dealt with its subsidiaries differently than with independent producers in that its subsidiaries received life of lease contracts as opposed to the twenty-year term contracts received by independent producers. No substantial difference existed between the two. In terms of the twenty-year contract, depletion of the lease after twenty years was so great that no new purchaser would consider negotiating a contract on the lease. In effect, then, a renegotiation of the twenty-year lease by the same parties virtually always would occur. In conclusion, I find that the natural gas purchase contracts which form the basis for plaintiff's claims of conspiracy to fix prices in restraint of trade were arms-length contracts negotiated between purchaser and seller which did not restrain trade, did not fix prices and did not amount to illegal conspiracy.[4]

■ Plaintiff's claims of conspiracies based on fraudulent concealment of the ac-

tual revenues received for gas and liquid hydrocarbons and for failure to accurately account for liquid hydrocarbons according to the terms of the leases fails on the basis of the stipulation entered into by counsel at trial. It was stipulated that defendants-lessees accurately reported to the USGS volumes of gas produced from the Tribe's leases, that they correctly reported to the USGS the consideration received by them for the sale of that production to SUG and that they paid to the Tribe, or more accurately to the Secretary on behalf of the Tribe, royalties at the appropriate rate, as that rate was determined by the leases' terms, based on such reported production and sales revenues. (Transcript, Volume VII, 7). It is acknowledged that plaintiff makes the additional claims that defendants have at various times failed to pay royalties based on a dual accounting method, being the higher of a BTU-adjusted or net realization method,[5] on gas produced and that the Secretary has failed to accurately determine the correct basis on which royalties were to have been paid to the Tribe. These claims however do not raise the specter of antitrust violations but rather concern plaintiff's common law claims against defendants-lessees for breaches of the leases and against the Secretary for breach of his fiduciary duty.

Plaintiff has failed to establish its conspiracy claims under the antitrust laws by a preponderance of the evidence and they will therefore be dismissed with prejudice.

■ At trial, plaintiff raised its claim that certain of the defendant energy companies in the past had interlocking directorates in violation of Section 8 of the Clayton Antitrust Act, 15 U.S.C. § 19. A Section 8 violation exists when two or more corporations, one with a net worth in excess of one

---

**4.** This finding applies as well to plaintiff's claim based on the settlement between Aztec and SUG of the State Court cases mentioned above. The price SUG agreed to pay, $.676 per mcf, BTU-adjusted, was nearly the seventy cents sought by Aztec in its Dallas County petition.

**5.** The BTU-adjusted method of accounting requires that the base price for gas produced be

adjusted upward or downward according to the heating value of such gas. The net realization method of accounting involves a determination of the value of component parts of the gas stream derived by processing gas through a gasoline extraction plant, with allowance made for the cost of manufacturing such component parts.

million dollars, who are competitors such that any agreement between the companies might constitute a violation of the antitrust laws, share a common director. *Protectoseal Co. v. Barancik*, 484 F.2d 585, 589 (7th Cir. 1973); 15 U.S.C. § 19. *See also, United States v. Sears, Roebuck & Co.*, 111 F.Supp. 614 (S.D.N.Y.1953). Relief, as well as standing to sue, is predicated on a claim of injury of the sort contemplated by the antitrust laws. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Relief may include injunctive relief pursuant to 15 U.S.C. § 26 and treble damages under 15 U.S.C. § 15. A corporation is subject to suit under Section 8. *SCM Corp. v. Federal Trade Commission*, 565 F.2d 807, 811 (2d Cir. 1977), cert. den., 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

Alleging antitrust injury based on the claimed Section 8 violation, plaintiff has standing to sue under 15 U.S.C. § 15. Because plaintiff's claim is one for damages and not for injunctive relief, *see*, Plaintiff's Amended Proposed Findings of Fact and Conclusions of Law, at 33, ¶ 31, the issue of mootness so often associated with Section 8 litigation is not present in this law suit. *See, e. g., United States v. W. T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *SCM Corp. v. Federal Trade Commission*, 565 F.2d at 812.

Plaintiff bases its claims on at least three separate violations of Section 8.[6] In 1972, Supron and SUGC had common directors. From 1972 to 1975, Aztec and Supron had common directors. From time to time including 1976, SUG, SUGC, Supron and Aztec all had at least one common director. At all times during which they had common directors, these companies were competitors in the sale of natural gas. The elimination of competition by agreement between any of these companies might have constituted a violation of the antitrust laws. At all times during which these companies had common directors, Supron, Aztec and SUG each had net worth in excess of one million

dollars. Plaintiffs, therefore, have proved technical violations of Section 8 of the Clayton Antitrust Act. However, having found above no substantive violations of the antitrust laws as claimed by plaintiff, and finding that these technical violations of Section 8 without more caused no injury to plaintiff, and in light of the fact that plaintiff seeks not injunctive relief but damages against these defendants, I conclude that plaintiff's claims under Section 8 of the Clayton Antitrust Act should be dismissed. *Gottesman v. General Motors Corp.*, 436 F.2d 1205, 1210 (2d Cir.), cert. den., 403 U.S. 911, 91 S.Ct. 2208, 29 L.Ed.2d 689, reh. den., 404 U.S. 876, 92 S.Ct. 29, 30 L.Ed.2d 125 (1971).

## THE TRIBE'S COMMON LAW CLAIMS

Plaintiff claims that defendants-lessees have breached the terms of the several leases which are the subject matter of this litigation. The Tribe claims that lessees have failed to diligently develop their leaseholds, have failed to drill offset wells to protect the leases from drainage, have failed to accurately account for royalties based on production from the leases and have failed to account for liquid by-products and royalties thereon produced from natural gas extracted from wells on the leases. Defendant Secretary of the Interior is charged with a breach of his fiduciary duty in failing to take appropriate action to make determinations necessary under the lease terms and to require the lessees to perform their obligations as set out in the lease terms.

### Diligent Development

The rule to be applied concerning plaintiff's claim of failure to diligently develop the leases is one of New Mexico law. *Clayton v. Atlantic Refining Co.*, 150 F.Supp. 9 (D.N.M.1957). The law of New Mexico embraces the "prudent operator" rule. *Id.*, at 16. Under the prudent operator rule, a lessee is held to act in a manner which "would be reasonably expected of operators of ordinary prudence, having re-

---

**6.** A fourth claimed violation involves only SUG and SUGC who are no longer parties defendant in this action. Their absence renders this fourth claim immaterial.

gard to the interests of both lessor and lessee . . . ." *Brewster v. Lanyon Zinc Co.*, 140 F. 801, 814 (8th Cir. 1905). What is required of an operator-lessee must be determined on a case by case basis giving due consideration to the totality of the circumstances. *Sun Oil Co. v. Frantz*, 291 F.2d 52, 55 (10th Cir. 1961). An alternative formulation of the rule indicates that a lessee must continue to develop a lease if there is an expectation of finding gas without undue risk as well as an expectation of a payout within a reasonable time. What is to be considered a reasonable time varies with the circumstances. *Id.*, at 54–55.

Expert testimony at trial revealed a general consensus that a well may be considered economical to drill if preliminary studies indicate a three to one return on investment within three to four years of commencement of the well. Testimony further revealed a genuine difference of opinion, both between plaintiff's experts and defendants' experts and between experts testifying on behalf of the several defendants-lessees, as to the economics and prognosis for drilling any particular well based on geologic and economic considerations available to all of them. Significantly, the differences of opinion between defendants' experts indicated that some leeway must be given to each individual operator's decision to drill or not to drill particular wells on the leases. And while an operator is charged with the duty of having due regard for the interests of the lessor as well as itself, the lessee is not obliged to pursue development when, in its sound economic judgment, drilling such a well would result in minimally positive or negative economic results for itself.

To exemplify this concept, it is the Tribe's position that Exxon, as operator of Jicarilla Lease 104, should have drilled an additional one to three wells to the Gallup formation as of January 1, 1976. Exxon's response indicated that the wells presently on Lease 104 would recover substantially all the recoverable reserves in the Gallup formation and that while additional wells would increase the Tribe's royalty values initially by virtue of increased production, additional wells would also decrease the project life in the Gallup formation substantially. Additional wells, of course, would require significantly additional investment by the operator and according to Exxon's economic analysis, would actually decrease total profits both for Exxon and for the Tribe in the long run. Under these circumstances, Exxon cannot be said to have failed to diligently develop the lease in question.

The most important factor in determining whether the lessees have diligently developed the leases in question is the price of gas at any time at which it is claimed additional wells should have been drilled. By circumstance, the price of gas has increased dramatically from 1975 to date and according to all economic indicators, should continue to do so in the near future. It was the uniform response of defendants-lessees' experts at trial that additional wells proposed by plaintiff's experts were not economical in the years plaintiff claims they should have been drilled. This was as a result of the prices of gas prevailing at the time and the long payout period which would have been required based on those prices. Defendants' experts admitted that most of the wells proposed by plaintiff's experts either had in fact been drilled at times later than those proposed by plaintiff's experts or are included in defendants' proposed drilling programs for the near future. Defendants' experts attributed the inclusion of these many wells in their drilling programs to the significant and dramatic increase in the price of gas to date.

An additional factor in determining whether or not to drill is the geologic information available on which to base a reasoned decision as to whether drilling at any particular location will result in a well producing in paying quantities. Here too opinions differed as to whether the geologic information available suggested success or failure in developing producing wells at given locations. I find that defendants' decisions not to drill certain locations based on the geologic data available were informed and sound, if not always in agreement with the conclusions reached by plaintiff's ex-

perts. The fact that from time to time certain companies elected to go non-consent[7] on a well within a jointly held lease indicates further that agreement, even among producers in partnership, was not always the case.

After an extensive review of the record, I conclude that plaintiff's claim that defendants have failed to diligently develop the leases in question is not well taken. Defendants have proceeded to develop these several leases according to sound economic business principles. While the criteria established by defendants concerning the economics of any particular individual well are admittedly conservative, the speculative nature of the oil and gas business may in fact require that conservatism temper and inform sound business decisions. Defendants cannot be faulted for proceeding in such a manner.

Moreover, the recent inclusion of several wells proposed by plaintiffs in defendants' drilling programs indicates that defendants heretofore have decided not to drill these wells based on sound economic principles and not for speculative purposes as was claimed by the plaintiff. Indeed, defendants' experts testified that in spite of the almost certain price spiral in the natural gas market which of course will yield higher prices for gas from wells commenced later rather than earlier in time, defendants intend to drill wells as soon as economic indicators suggest it will be profitable to do so. The need for continued cash flow, a requirement for any business organization, was cited, and is deemed acceptable, as the reason for such activity.

An additional observation must be made on plaintiff's claim of defendants' failure to diligently develop these leases. In counterpoint to plaintiff's insistence that it would have preferred to take royalties on gas pro-duced at the lesser prices prevailing in the mid-1970's in order to utilize the cash in hand at that point in time, defendants have insisted steadfastly that because of the dramatic rise in gas prices, future production of the reserves remaining under these leases will produce royalties to the Tribe far in excess of royalties which would have accrued had the leases been more fully developed earlier.[8] Without question, there is merit to both arguments. The Tribe, one of a people historically impoverished relative to its more recent neighbors, certainly would have benefited from revenues accruing in the mid-1970's. On the other hand, testimony revealed that the Tribe will receive substantially higher revenues presently and in the near future as the result of the defendants' decisions to wait to develop the leases in question. Plaintiff's claim that such a conclusion is based on speculation and cannot be relied on flies in the face of the reality of the marketplace. While I am bound to my courtroom, my observations on such imposing realities as the rising price of gas are not.

Suffice it to say that the law of diligent development permits the lessee to consider its own economic well-being in addition to that of the lessor. Given the known substantial reserves underlying Reservation lands, the Tribe would appear to have been in a position to negotiate the acquisition of substantial capitalization needed for its desired projects by pledging future royalty revenues, sizeable in amount and prolonged in time, as collateral for whatever commitments it might have sought to make. To require operators to develop leases earlier than might be economically indicated, albeit according to the economics derived by the operator, so that the lessor might have cash revenues at the earliest time possible, is a result not required by the prudent operator rule.

---

7. Non-consent indicates the unwillingness of a joint lessee to share in the risk of any particular drilling operation. The joint lessee who drills does so at his own risk. If production is secured, the non-participating lessee suffers a financial penalty to the benefit of the lessee who drilled before being permitted to share in the proceeds of well production. *See, e. g.,*

Supron Exhibit SUP 11, Joint Operating Agreement, Article 10, at 6.

8. The evidence indicated this would be the case even assuming a rate of return of 20% annually on royalties accruing to the Tribe from 1971 through 1980.

Substantial evidence was adduced at trial regarding the Secretary's role in defining the concept of diligent development insofar as it pertains to the Jicarilla Tribe's leases. Representatives of the USGS testified that no guidelines for diligent development existed prior to the issuance of the Davenport Memorandum [9] except for the requirements that a lease produce within its primary term and that drainage of a lease be prevented by requiring the drilling of offset wells. The Davenport Memo itself would appear to indicate that development of leases on Indian lands has been left largely to the considered judgment and discretion of lessees, primarily to avoid duplication of effort by lessees and the severely understaffed offices of the USGS in the Southern Rocky Mountain Region.

■ From a practical viewpoint, Ms. Davenport's conclusion would appear to be reasonable. However, the Secretary has obligated himself and his governmental representatives to the most exacting standards required of a fiduciary of an Indian Tribe. *Seminole Nation v. United States,* 316 U.S. 286, 296–7, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942). Limited financial resources cannot excuse the Secretary from his strict fiduciary obligation to oversee leases on Indian lands and insure that lessees comply completely and timely with the terms thereof.

■ The Secretary may well have placed himself in a hopeless situation having bound himself to the standards of a fiduciary without the resources to satisfy those obligations. Directives have been set out in Ms. Davenport's memorandum and additionally in a memorandum to conservation managers of the Central, Eastern and Western Regions from the Acting Chief of the Conservation Division of the USGS subsequent to and in light of Ms. Davenport's memorandum, see, Government Exhibit G–35, purporting to establish guidelines concerning diligent development on Indian oil and gas leases. Whether these in fact comport with the concept of diligent development as that term has meaning in law is not an issue in this law suit. Accordingly, I decline to comment on those guidelines. What is in issue in this law suit, however, is the Tribe's claim that the Secretary has failed to satisfy his fiduciary duty to the Tribe under the leases.

I find that, notwithstanding the unique and extensive effort given by the USGS to monitoring the Tribe's leases and defendants-lessees' adherence to the terms therein,[10] the Secretary has breached his fiduciary duty to insure for the Tribe that its lessees have complied with the term of the leases which requires diligent development. It is not that the Secretary has provided too little in terms of satisfying his fiduciary duty but that it has come too late. That defendants have, in my opinion, diligently developed the leases is fortuitous and did not result from timely action taken by the Secretary.

Notwithstanding my conclusion above that defendants-lessees have not failed to diligently develop the leases in question, I find that the Secretary and his named representatives have failed to adequately monitor development of these leases sufficiently to insure compliance with the terms thereof. A declaratory judgment to this effect will be entered, and should it appear that the Secretary is unable or unwilling to comply with his fiduciary obligations on behalf of the Tribe, injunctive relief may be appropriate.

*Offset Wells*

■ Plaintiff claims, as a further breach of the leases, that defendants have failed to drill offset wells to protect drainage from leased lands and that the Secretary's failure to require such offset wells is yet another breach of his fiduciary duty under the leas-

---

**9.** The Davenport Memorandum, promulgated by Ms. Joan M. Davenport, Assistant Secretary of the Interior, in response to my September 7, 1978 Order, was made of Record March 12, 1979.

**10.** The Jicarilla Response Committee, formed in 1974 within the USGS Southern Rocky Mountain Regional Office in response to the Tribe's demands, spent approximately 1,200 man-hours investigating the Tribe's claims under the leases.

es. Regarding the general obligation under the leases to protect from drainage by drilling offset wells, I adopt the discussion in Section I–A of the Davenport Memorandum and incorporate it herein.

The leases which plaintiff claims are subject to drainage are numbers 101 and 150, both of which are held jointly by Supron and Southland. Following issuance of the Davenport Memorandum, USGS employee David Maldonado investigated the claims of possible drainage on these leases, concluding that they were not subject to drainage by the adjoining leases identified in the Davenport Memorandum and relied on by plaintiff. I find Maldonado's testimony to be competent and credible and therefore conclude that no drainage is occurring on leases 101 and 150 which requires the drilling of offset wells.

Although the USGS acted quickly and industriously in response to the memorandum of Ms. Davenport with regard to offset wells, I find that absent an order of this Court requiring the Secretary to make a determination regarding the question of drainage of leases on the Tribe's Reservation, such inquiry would not have been made. Accordingly, I conclude that the Secretary has breached his fiduciary duty under the leases to insure, on behalf of the Tribe, the protection of leased lands from drainage by requiring the drilling of offset wells. As was the case on the issue of diligent development, a declaratory judgment will enter to this effect, and injunctive relief, should it prove necessary, may be appropriate.

*Value*

Plaintiff's claims on the issue of value are again two-fold. It claims that defendants-lessees have breached the terms of the several leases by failing to accurately account for value per the lease terms. Plaintiff seeks an accounting and damages on the basis of the claimed breaches. The plaintiff also lodges a claim against the Secretary to the effect that he has failed to accurately determine value according to the lease terms for the purpose of computing royalties to the Tribe. Plaintiff seeks declarato-

ry judgment that the Secretary has breached his fiduciary duty to accurately account and to require defendants-lessees to account for and pay royalties according to the lease terms. By such a declaratory judgment the Secretary would be obliged to require defendants-lessees to accurately account for and pay any additional royalties due under the lease terms.

Partial summary judgment on the issue of value was granted to defendants by my Order of September 7, 1978. In that same Opinion and Order, I deferred ruling on the motion for summary judgment on the issue of dual accounting pending resolution of administrative proceedings then, and now, pending. In a subsequent Memorandum Opinion and Order dated December 19, 1978, I denied plaintiff's motion to reconsider the grant of summary judgment on the value issue. In my Memorandum Opinion and Order dated April 19, 1979, I stated that if at trial plaintiff established that the Secretary's computation of value was based on fraudulent information and therefore was clearly erroneous, I would reconsider my ruling on the issue of value.

It has become clear, on review of the Record, that my summary judgment ruling on the issue of value was incorrect based on factors other than the alleged fraud perpetrated on the Secretary. Fairness and justice require that I right wrongs when it is in my power to do so. Revision of prior rulings in this action is within the scope of my authority. Fed.R.Civ.P. 54(b). Defendants had the opportunity to brief the value issue prior to my ruling on summary judgment. By moving for summary judgment, defendants acknowledged the absence of any genuine issue as to any material fact. Fed.R.Civ.P. 56(c). That state of affairs has not changed in the interim. Accordingly, I am free to revise my ruling on the issue of value and also my statement that reconsideration would follow only if proof of fraud was adduced at trial.

I find, on the basis of the stipulation entered into by counsel at trial, that defendants accurately reported the volumes of gas produced from the leases and the

prices received on sales of such gas at the wellhead and that defendants accurately paid royalties based on the volumes and prices reported to the USGS. Such a finding, however, does not answer the question whether defendants-lessees paid royalties to the Tribe in the amount to which it was entitled under the lease terms and the federal regulations which inform them. *See*, Standard Lease Form 157, ¶ 3(c); 30 CFR §§ 221.46–.47, 221.50–.52.[11]

If the Secretary has breached his fiduciary duty because the method by which he computed royalties did not derive for the Tribe the highest royalties payable under the lease terms and the federal regulations, or because he has failed to accurately account or require defendants-lessees to account according to the lease terms, then the defendants have in fact breached the terms of the lease, albeit through no apparent fault of their own. What is required to determine whether the Secretary has in fact breached his fiduciary duty to the Tribe is inquiry into the relevant lease terms and federal regulations, since the Secretary's obligation to the Tribe is necessarily defined therein.

Defendants-lessees' insistent claim throughout these proceedings on the issue of value has been that the Secretary in his discretion accepted "[t]he actual amount realized by the lessee from the sale of said products" as "conclusive evidence" of value for the purpose of computing the Tribe's royalties. Lease, *supra* at ¶ 3(c). Indeed, the fact that the Secretary in his discretion was authorized by the lease term to accept sales price as "conclusive evidence" of value was the basis for granting summary judgment on this issue in September, 1978 and denying plaintiff's motion to revise in December, 1978. Notwithstanding my conclusion then, it is my conclusion now that the Secretary's fiduciary obligation to the Tribe necessarily circumscribes the discretion granted him by the lease terms should it be determined that the two are in conflict.

The relevant term of the lease provides:

3. . . . [T]he lessee hereby agrees: (c) Rental and royalty.—To pay, . . a royalty of 12½ percent of the value or, amount of all oil, gas, and/or natural gasoline, and/or all other hydrocarbon substances produced and saved from the land leased herein . . . . "[V]alue" for the purposes hereof may, in the discretion of the Secretary, be calculated on the basis of the highest price paid or offered . . . at the time of production for the major portion of the oil of the same gravity, and gas, and/or natural gasoline, and/or all other hydrocarbon substances produced and sold from the field where the leased lands are situated, and the actual volume of the marketable product less the content of foreign substances as determined by the oil and gas supervisor. The actual amount realized by the lessee from the sale of said products may, in the discretion of the Secretary, be deemed mere evidence of or conclusive evidence of such value. . . . . It is understood that in determining the value for royalty purposes of products, such as natural gasoline, that are derived from treatment of gas, a reasonable allowance for the cost of manufacture shall be made, such allowance to be two-thirds of the value of the marketable product unless otherwise determined by the Secretary of the Interior on application of the lessee or on his own initiative, and that royalty will be computed on the value of gas or casinghead gas, or on the products thereof (such as residue gas, natural gasoline, propane, butane, etc.), whichever is the greater. Standard Lease Form 157, ¶ 3(c).

In its simplest terms, the lease provides that royalty is based on the value of gas. Value is based on the price and the volume of gas produced. According to the lease term, value can be computed any number of ways. Sales price is one basis for determining value and clearly the most expedient for the purpose of computing royalties. Value based on sales price is determined at

---

11. 25 C.F.R. § 171.13(a) also speaks to royalty rates under Tribal oil and gas leases, but only to reiterate the express terms of ¶ 3(c) of the lease.

the point of sale, *Kretni Development Corp. v. Consolidated Oil Corp.*, 74 F.2d 497 (10th Cir. 1934), cert. den., 295 U.S. 750, 55 S.Ct. 829, 79 L.Ed. 1694 (1935), in this case at the wellhead. Value (price times volume) can be computed on the gas stream as a whole, e. g., at the wellhead, or on the component parts of the stream, e. g., at the tailgate of a gasoline extraction plant. Value of component parts, when added together, produce aggregate value on which to compute royalties.[12] Hydrocarbon substances processed through a gasoline extraction plant and sold at the tailgate take the form of liquids, or liquid by-products of the gas, and residue gas. When gas is processed into component parts, the lease and the regulations require that value of the component parts be determined and then compared to the value of the gas stream as a whole (being volume times either sales price or "highest price paid or offered . . ."). Royalties are to be paid on whichever is the greater. Lease, *supra* at ¶ 3(c); 30 C.F.R. §§ 221.47, .50.

This standard lease has attempted to provide contingent bases for computing royalties in light of the various alternative methods by which gas may be produced and sold. The last sentence in paragraph 3(c) applies when gas produced from the lease is subject to "treatment," as when it is processed through a gasoline extraction plant. Two provisions are set out in that final sentence. The first states that

. . . in determining the value for royalty purposes of products, such as natural gasoline, that are derived from treatment of gas, a reasonable allowance for the cost of manufacture shall be made

. . . .

The second states that

. . . royalty will be computed on the value of gas or casinghead gas, or on the products thereof (such as residue gas, natural gasoline, propane, butane, etc.), whichever is the greater.

This latter provision requires that the Secretary, or the lessee, determine the value of both unprocessed gas, e. g., gas or casinghead gas, and processed gas, e. g., residue gas and liquid by-products. Determining value of processed gas necessarily requires a determination of the aggregate value of the products of the various hydrocarbon substances recovered through processing, taking into account the cost of manufacturing allowance provided for in the lease.

The regulations contemplate this application of the net real method of accounting. 30 C.F.R. § 221.50 provides:

(a) *Royalty accrues on dry gas*, whether produced as such or as residue gas *after the extraction of gasoline.*

(c) . . . for the purpose of computing royalty *the value of wet gas* shall be either the *gross proceeds accruing to the lessee* from the sale thereof or *the aggregate value* determined by the Secretary *of all commodities*, including residue gas, obtained therefrom, *whichever is greater.* (emphasis supplied).

The regulations, based on the lease term, require the Secretary to make two comparisons. He must compare sales price with the value of production on gas produced at the wellhead, and sales price with value by the net realization method of accounting when residue gas and liquids are produced at the tailgate of a gas plant. 30 C.F.R. §§ 221.-47, .50(a), (c). Royalties are computed on the higher of the two values derived from these two comparisons. *Id.*

Defendants argue that because they do not operate such a gas plant (Supron does not ascribe to this argument for the years 1971–6, nor could it) they are not obliged to account by net real method and that when gas is sold at the wellhead, value, based on sales price, is determined there. The explicit terms of the regulations indicate that unlike value based on sales price, value based on net real accounting is not tied to

---

**12.** Determining aggregate value may also be required at the wellhead if liquids are separated there by mechanical means. Plaintiff makes no claim in this case that royalties on liquids separated at the wellhead have not been properly

reported and paid. It is important to note, however, that a determination of aggregate value may be required elsewhere than at the tailgate.

the point of sale. *Id.* The cases cited by defendants are not to the contrary. The lease terms addressed in those cases differed from those at issue here in that they provided fewer alternative methods by which to calculate value. *See, Barby v. Cabot Corp.,* 465 F.2d 11, 13 n. 1 (10th Cir. 1972); *Kretni Development Corp. v. Consolidated Oil Corp., supra. Compare Matzen v. Hugoton Prod. Co.,* 182 Kan. 456, 321 P.2d 576, 582–3 (1958); *Phillips Petroleum Co. v. Johnson,* 155 F.2d 185, 188–9 (5th Cir.), cert. den., 329 U.S. 730, 67 S.Ct. 87, 91 L.Ed. 632 (1946). It is important to note that neither of the two provisions in the last sentence of paragraph 3(c) is limited to circumstances where the "treatment of gas" is done by the lessee or at his direction. The net realization method of accounting, described by the second provision of this last sentence of paragraph 3(c), is required of any lessee who produces gas which is later processed into component products. Gas produced from the Jicarilla leases was processed into component parts through the Lybrook Gasoline Extraction Plant.

▆▆▆▆ I conclude that where, as here, gas produced from the lease is processed into component products, dual accounting is required by the terms of the lease. Accordingly, the Secretary had the obligation to require defendants-lessees to account on the net realization method. Defendants-lessees never accounted for gas produced from the leases on the net realization method, nor were they required to do so by the Secretary. Because the Secretary failed to implement this requirement of dual accounting, he has failed to accurately account for value according to the terms of the lease.

El Paso Natural Gas Company (El Paso) has paid producers for natural gas on a BTU-adjusted basis for some time, at least since as early as 1965. Pursuant to an agreement settling prior claims entered into between El Paso and the Tribe, El Paso has reported voluntarily by a dual accounting method for some time. El Paso's agreement to dual account, arising out of a settlement agreement, has had no influence on my decision that the lease term requires lessees to account by the net real method. *Sun Oil Co. v. Govostes,* 474 F.2d 1048, 1049 (2d Cir. 1973).

Until 1974, producers selling natural gas to SUG paid a base contract price plus a penny ($0.01) per thousand cubic feet (mcf) which it is claimed satisfied any obligation the producer had to account for liquids in the gas stream. From 1974 on, producers have received a BTU-adjusted price for gas sold to SUG. British Thermal Units (BTU's) are one way of measuring and valuing the liquid heating content of the natural gas stream. Whether it is the method which derives the highest royalties to the lessor depends on the BTU content and the base contract price of the gas. I have concluded that the Secretary was and is required to have producers account on behalf of the Tribe by a dual accounting method. Whether or not value is greater by the BTU-adjusted or the net real method, under the strict terms of the lease, does not relieve the Secretary of his duty to require producers to account both ways. And whether the "price plus a penny" method of payment made prior to 1974 satisfied the producers' obligation to account for liquids is a question which need not be reached in light of my conclusion that the Secretary was and is obliged to require dual accounting.

If it is without question, given the significantly higher prices received for gas in the San Juan Basin, that at present or, for example, since 1976, the BTU-adjusted method of accounting will always derive the highest royalty for the Tribe, the terms of the lease may be altered to relieve the Secretary, and thereby the producers, of accounting by both methods. I will not rewrite the terms of the lease for the parties. Provision for such alteration is made in the lease terms. Lease, *supra* at ¶ 3(g).

I concur with counsel for Exxon that the issue of dual accounting is "inextricably bound" to the issue of value. Because the Secretary has erred in determining value without taking into account net realization, my summary judgment ruling on the issue of value, which otherwise would have been

determinative on the dual accounting issue, must be withdrawn as incorrect as a matter of law.

It may be argued that I have taken and decided the dual accounting issue presently pending before the United States Interior Board of Land Appeals (IBLA). The issue before the administrative appellate body is whether Supron, a lessee and operator of the Lybrook plant during the time for which additional royalties were assessed (1974–6), was required to make a dual accounting because it was both a lessee and the operator of the Lybrook plant. The issue I have decided is whether, according to the terms of the lease, lessees (whether or not they are plant operators) are required to account by a dual accounting method. Evidence at trial revealed that the USGS certified this question to the Solicitor's Office of the Department of the Interior some time ago and has never received an answer. Whether the issue before the IBLA is subsumed in the issue I have decided is for it to determine. I would only comment that since Supron, like the other defendants, is a lessee, it like the others, is obliged to account by the dual accounting method for the years in question. Of course, it need not reaccount for the years 1974–6 unless the Secretary concludes it has done so incorrectly.

Assuming arguendo, however, or should it be determined on appeal, that I have in fact invaded the province of the IBLA, I would support such action with the following observations. The dual accounting issue is a collateral issue necessary to the resolution of a primary issue pending before me now, i. e., whether the Secretary has breached his fiduciary duty to the Tribe. Plaintiff was not a party to the first appeal from the order of the oil and gas supervisor. Its motion to intervene in that proceeding was denied. Whether leave to intervene in the second administrative appeal will be granted the Tribe is not apparent from the Record. Plaintiff, in this action, can and has litigated the issue of the Secretary's breach and necessarily thereby the issue of dual accounting. I see no reason to foreclose or postpone plaintiff's day in court on the basis of an administrative appeal in which plaintiff may or may not be permitted to participate.

Further, the act giving rise to Supron's administrative appeals was the December, 1976 letter order of the oil and gas supervisor. This order was promulgated more than a year and a half after plaintiff had filed suit in this Court seeking relief, inter alia, from defendants-lessees' alleged failure to account according to the lease terms. The action of the oil and gas supervisor came about at least in part as a result of the continual prodding of the Tribe and its attorneys, both before and after this action was filed. It is not readily apparent, even in the face of the substantial rule requiring deference to administrative proceedings, why the Tribe should be foreclosed from gaining resolution of an issue brought here as a result of belated agency action the administrative appeals from which have been and may continue to be without the Tribe's participation.

At trial, plaintiff's counsel stipulated that no claim was lodged against Southland for failing to account by the net real method, but that Southland's alleged failure to account for royalties on liquids prior to 1974 remained in issue. I hold, based on this stipulation, that neither the Secretary nor Southland need account by the net real method with regard to Southland's interests in the Tribe's leases for the years 1974 and thereafter. Acknowledging the inconsistency of this result, I state only that plaintiff is bound by the stipulation of counsel.

Whether the Secretary has breached his fiduciary duty by failing to comply with the terms of the lease in other particulars is an issue which need not be addressed here. The Secretary is directed to review the lease terms, the regulations and the USGS Conservation Division Manual, Part 647, to consider whether further action is required to comply with his duty under the leases. Having found the Secretary to have breached his fiduciary duty to the Tribe in one respect, I can render, without more, declaratory judgment in favor of the Tribe to

that effect. Granting such a declaratory judgment obligates the Secretary to require defendants-lessees, except Southland from 1974 forward and Supron from 1974–6, to render accounting by the dual accounting method for the years 1970 to the present. The cost of manufacturing allowance to be determined by the Secretary according to the terms of the lease and the regulations, 30 C.F.R. §§ 221.46, .51, shall be based on figures obtained from the Lybrook plant for the relevant years in question. The Secretary shall submit for my approval his accounting no later than ninety (90) days from the date of this Opinion. He shall incorporate into his own any accounting required of defendants-lessees for him to make his accounting complete and accurate.[13]

Because it is not certain that the Secretary's accounting will result in a ruling against defendants-lessees for additional royalties, it would be premature to rule on defendant Southland's cross-claim against Gas Company of New Mexico for payment of excess royalties under an indemnity provision in the gas purchase contracts effected between them. I will defer ruling on the claim of indemnity under the cross-claim pending receipt and approval of the Secretary's accounting.

*Cancellation of the Leases*

Included in the relief sought by plaintiff was a request that in the event it was determined that defendants-lessees have breached the terms of the leases the Secretary be ordered to cancel the leases on behalf of the Tribe. Although I have concluded that defendants-lessees have in fact breached the terms of the lease, I have stated that such breach was technical in nature by virtue of the Secretary's acquiescence in the manner by which defendants-lessees reported for accounting purposes and that the breach was through no apparent fault of defendants-lessees. Accordingly, I decline to require the Secretary to order the leases cancelled. Defendants have prevailed on the claims against them regarding offset wells and diligent develop-

ment as well as those involving claims of antitrust violation. I see no reason to require defendants-lessees to give up the opportunity to continue working these leases for their own benefit as well as that of the Tribe.

I feel obliged to comment that the more appropriate remedy, were it available to the Tribe, would be the excision of the Secretary as the fiduciary through whom the Tribe is obliged to deal in its affairs with defendants-lessees. Plaintiff, like many Indian Tribes in recent times, has demonstrated its desire and ability to carry on business relations on its own, devoid of the paternalistic shroud in which it must be enveloped by the Secretary by virtue of the Tribe's legal status as a ward of the United States. It is Congress, however, and not the Court who is empowered to liberate the Indian Tribes from the protection imposed on them by the United States Government.

### MOTIONS TO STRIKE

After the parties had filed post-trial briefs, defendant Supron moved to strike plaintiff's trial brief alleging several grounds as bases therefor. Defendant Southland joined in Supron's motion adopting Supron's grounds and stating an additional ground therefor. Defendant, Secretary of the Interior, also moved to strike certain portions of plaintiff's post-trial brief. Plaintiff responded to the motions. Having considered the motions and memoranda of counsel and further being advised in the premises, I conclude that the motions to strike are not well taken and should be denied.

### COSTS

Plaintiff, having prevailed on its common law claims in part shall recover costs thereon. Although I have concluded that the defendants-lessees have breached the terms of their leases, such breach was the result of the Secretary's own breach of his fiduciary duty to the Tribe. Accordingly, pursuant to 28 U.S.C. § 2412, the Secretary shall

13. Such as corrected forms 9–361A.

bear a portion of plaintiff's costs insofar as such costs pertain to those issues on which plaintiff has prevailed against the Secretary.

Much of plaintiff's preparation was cumulative on its antitrust and common law claims. However, I find that the common law claims on which the plaintiff prevailed against the Secretary required more extensive and complex preparation than that required to present the antitrust claims. I conclude that two-thirds of plaintiff's costs should be assessed against the Secretary, the remainder to be borne by plaintiff. Defendants-lessees shall bear their own costs, as shall the Secretary.