Celestine **BARBY** and Helen Barby, Plaintiffs-Appellants,

v.

**CABOT CORPORATION,** Defendant-Appellee.

No. 71–1606.

United States Court of Appeals, Tenth Circuit.

Aug. 7, 1972.

Rehearing Denied Sept. 7, 1972.

**12**

George L. Verity and Burck Bailey, Oklahoma City, Okl. (Brown, Verity, Brown & Baker, and Fellers, Snider, Baggett, Blankenship & Bailey, Oklahoma City, Okl., on the brief), for plaintiffs-appellants.

C. Harold Thweatt, Oklahoma City, Okl. (Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., on the brief), for defendant-appellee.

Before LEWIS, Chief Judge, and KILKENNY * and DOYLE, Circuit Judges.

KILKENNY, Circuit Judge.

This appeal involves the construction of certain gas leases and purchase-sales contracts under which appellants claim they have not been paid the proper royalties. After extensive pre-trial procedures, including the production of documents and the filing of interrogatories and answers thereto, each of the parties moved for a summary judgment. Following argument, the lower court allowed appellee's motion and entered a summary judgment in its favor. We affirm.

## CONTENTIONS

Appellants contend that under a proper construction of appellee's sales contracts with Panhandle Eastern Pipe Line Company [Panhandle], appellee has sold only the "dry gas" produced from appellants' wells to Panhandle. As a result, appellee has never accounted to appellants for the liquefiable hydrocarbons, or "wet gas," which the appellee removed from the gas.

## FACTUAL BACKGROUND

The oil and gas leases with which we are here concerned give the lessee [appellee] the complete power to sell the gas produced, subject only to the corresponding duty to pay appellants the agreed royalty on all gas marketed. Typical examples of the royalty clauses

* John F. Kilkenny, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

are set forth in the footnotes.[1] As can be seen, royalties were to be paid on all gas marketed at the wellhead, or if marketed off the premises, royalties on the market value at the well. That the parties distinguished between "oil" and "gas" is demonstrated by the fact that a separate paragraph in each lease was devoted to the royalties to be paid on oil.

The gas sales contracts here involved were negotiated between Panhandle and appellee, and Panhandle and a third party [which contract appellee took by assignment]. Through these agreements, appellee sold to Panhandle the gas produced under its leases with appellants, retaining to itself an option, to be exercised within one year, to construct a gas processing plant for the extraction of the heavier liquefiable hydrocarbons, if any. In addition, both contracts provided, among other things: (1) that ownership and control of the gas should pass from appellee to Panhandle at the delivery point and point of connection between the facilities of appellee and Panhandle, at or near the mouth of each well; (2) the extraction processing, if elected, to be at a "mutually agreeable plant site in Beaver County, Oklahoma"; (3) reimbursement to be made to Panhandle for loss in British Thermal Unit (BTU) content and shrinkage in volume caused by removal of liquefiable hydrocarbons; (4) the wellhead price of the gas to be adjusted between appellee and Panhandle depending upon the BTU content of the gas from a particular well.

Within the time limitation, appellee and other producers, who had committed their gas to Panhandle under similar or identical contracts, elected to build, at heavy expense, a processing plant which became known as the Beaver Gas Products plant. Subsequent to the completion of the plant, gas from the various wells was delivered and the liquefiable hydrocarbons were extracted.

## DISCUSSION

Although appellants' overall theory contains inconsistencies, there is no doubt but that they would construe the gas sales contracts between Panhandle and appellee so as to divide the gas flow at the wellhead into two streams, one "dry gas" and the other "wet gas," or liquefiable hydrocarbons. Appellants contend that the reservation to appellee of the option to build a gas extraction plant indicates that only the "dry gas" was sold to Panhandle. They argue that they are being paid their royalty on the "dry gas" but not on the "wet gas" and that appellee is marketing the "wet gas" off the leased premises within the meaning of the royalty clauses.

---

1. "CABOT'S LEASE 0-703 . . .
'The lessee shall monthly pay lessor as royalty on gas marketed from each well where gas only is found, one-eighth (⅛) of the proceeds if sold at the well, or if marketed by lessee off the leased premises, then one-eighth (⅛) of its market value at the well.'
"CABOT'S LEASE 0-821 . . .
'3. In consideration of the premises the said lessee covenants and agrees:
*    *    *    *    *
(b) To pay lessor for gas of whatsoever nature or kind produced and sold, or used off the premises, or used in the manufacture of any products therefrom, one-eighth, at the market price at the well for the gas sold, used off the premises, or in the manufacture of products therefrom.'
"CABOT'S LEASE 0-600 . . .
'3. The royalties to be paid by lessee are:

*    *    *    *    *
B. On gas, including casinghead gas and all gaseous substances, produced from said land and sold or used off the premises or in the manufacture of gasoline or other products therefrom, the market value at the mouth of the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; . . .'
"CABOT'S LEASE 0-320 . . .
'4. The lessee shall pay, lessor, as royalty, one-eighth of the proceeds from the sale of the gas, as such, for gas from wells where gas only is found, . . . .'
"CABOT'S LEASE 0-755 . . .
'4. . . . The lessee shall pay lessor as royalty ⅛ of the proceeds from the sale of gas as such at the mouth of the well where gas only is found . . . .' "

Appellants read something into the language of the gas leases and sales contracts which we cannot find. Generally, "oil" as used in the agreements before us means crude or unrefined petroleum which is measured and sold in volume according to grade or gravity, while "gas" consists of invisible vapors which are produced from the earth, containing varying amounts of hydrocarbon, some of it denominated "dry" and in other instances "wet," depending upon the amount of liquid hydrocarbons which can be extracted therefrom. O'Neal v. Union Producing Co., 57 F.Supp. 440 (W.D.La.1944); McCoy v. United Gas Public Service Co., 57 F.Supp. 444, 445 (W.D.La.1932). Absent an expression of intent to the contrary, the purchase of natural gas at the well carries with it all of its constituent parts and the rights to separate or extract any of its hydrocarbon-based elements. O'Neal v. Union Producing Co., 153 F.2d 157 (5th Cir. 1946), cert. denied 329 U.S. 715, 67 S.Ct. 46, 91 L.Ed, 621 (1946); see, Northern Natural Gas Co. v. Grounds, 441 F.2d 704, 712–713 (10th Cir. 1971).

In their answers to interrogatories, the appellants concede: (1) that the gas sales contracts by which appellee committed the gas produced from the wells were arms-length contracts; (2) that on the date the appellee committed the gas to Panhandle, a higher or better price for the gas could not have been obtained; (3) that appellee has properly marketed the appellants' gas; and (4) that under the leases the royalties are to be paid on the basis of the market value of the gas at the well.

The language of the contracts between appellee and Panhandle shows that all the gas *was sold at the wellhead*; title to the gas passes to Panhandle there, and the only interest reserved to appellee is the option to, in effect, repurchase the liquefiable hydrocarbons. Appellee is required to invoke the extraction option during the first contract year, and the processing plant must be in operation by the end of the third contract year of the agreement. By the terms of the option, appellee is required to furnish separate consideration for the extraction of the liquefiable hydrocarbons. When the liquefiable hydrocarbons are extracted, adjustments are made in the form of rebates by appellee to Panhandle for the loss in volume and BTU content of the gas.

The appropriate unprocessed value of the liquefiable hydrocarbons, if any, is here reflected in the wellhead market price. Those liquefiable hydrocarbons which are readily removed by field separation equipment, which appellee is required to maintain to prevent impurities from entering the pipeline of Panhandle, apparently have no market value. Those liquefiable hydrocarbons which remain after the gas passes through the field separation equipment have limited value to Panhandle. The contracts provide a sliding scale for purchase price depending upon the wellhead BTU content, but Panhandle does not pay an additional price for BTU values in excess of 1200. Therefore, any liquefiable hydrocarbons that boost the BTU level above that point can be considered of no consequence to the market value of the gas at the wellhead. By terms of the agreement, Panhandle is reimbursed for any effect the extraction process has on volume and BTU levels (at the contract price) within the marketable range. Finally, we note that the extraction of the liquefiable hydrocarbons may well have been necessary for the long-range transportation of the gas: (1) the time limitation in the option indicates that Panhandle wanted to be certain that some provisions would be made for extraction; if appellee did not process the gas, Panhandle could have looked to another party to perform that service, or itself perform the service; (2) appellee was given no incentive to provide Panhandle with gas having a BTU level in excess of 1200; (3) no upward adjustment of the wellhead price is provided

for if appellee *did not exercise* its extraction option.

■ The fact that appellee did repurchase and remove the liquefiable hydrocarbons jointly with other producers, and did manufacture valuable products, is of no consequence here. The appellants, by choice, tied their royalty payments to the wellhead market value of the gas. Nor, for that matter, can appellants complain that they were unaware that processing might increase the ultimate value of the gas off the premises. Northern Natural Gas Co. v. Grounds, supra. In O'Neal v. Union Producing Co., 57 F. Supp. at 443, in discussing a gas lease executed in 1926, the court said:

"*It can scarcely be said, therefore, that the plaintiffs did not know or could not have had in contemplation at the time of the lease conditions which were fairly well known to the public generally. If they saw fit to make a contract for the sale of the production of a 'well producing gas only' and 'to be paid one-eighth (⅛) of the value of such gas, calculated at the rate of market price per thousand cubic feet',* there is no reason in law or morals why they could not do so. If it were sold by the lessee without such extraction, undoubtedly the lessor could claim no more than one-eighth of the price received. *And to say that the price should be determined according to the one course or the other pursued by the lessee, would make it depend, not upon the value of the gas as fixed by the contract, but the purpose to which it was put by the lessee.* It would be just as reasonable to contend that, if through some scientific discovery, it should be found that natural gas could be used for some purpose increasing its value to the lessee several fold, he should be required to pay the lessor a proportionate increase in price for the gas, notwithstanding a fixed rate of so many cents per thousand cubic feet, as to hold that because gasoline has been extracted it should pay to the lessor a portion of the value thereof." [Emphasis supplied.]

As *O'Neal* clearly shows, the valuable use of products extracted from natural gas is not a recent phenomenon. Appellants could, if they so desired, have insisted on a contractual provision which would permit them to participate in all of the profits arising from the extraction of the liquefiable hydro-carbons. Unlike Phillips Petroleum Co. v. Johnson, 155 F.2d 185 (5th Cir. 1946) and Matzen v. Hugoton Production Co., 182 Kan. 456, 321 P.2d 576 (1958), cited by appellants, the contracts before us demonstrate that there was here a market value of the gas at the wellhead. Appellants are precluded from contending that they are entitled to royalties on the end products after extraction. Kretni Development Co. v. Consolidated Oil Corp., 74 F.2d 497 (10th Cir. 1934). Since appellants do not claim that they could have secured a better price at the wellhead and do not suggest a conspiracy between appellee and Panhandle to control the wellhead price, the fact that the price may not reflect the actual or processed value is of no consequence. *Cf.*, Craig v. Champlin Petroleum Co., 435 F.2d 933 (10th Cir. 1971); Shamrock Oil & Gas Corp. v. Coffee, 140 F.2d 409 (5th Cir. 1944).

Other cases cited by the respective parties have received our attention, but we do not believe they merit discussion.

The general principles outlined in Oklahoma Tax Commission v. Sun Oil Co., 489 P.2d 1078 (Okl.1971), support our conclusion that appellants are not entitled to relief and that the judgment of the lower court must be affirmed.

It is so ordered.