767 F.2d 143
 CROSBY-MISSISSIPPI RESOURCES, LTD., Plaintiff-Appellant,
v.
SAGA PETROLEUM U.S., INC., Scurlock Oil Company, and Saga
Products Company, A Partnership, by and through
Saga Petroleum U.S., Inc., a partner,
Defendants- Appellees.
Stewart GAMMILL, III, Plaintiff-Appellant,
v.
SAGA PETROLEUM U.S., INC., Scurlock Oil Company, and Saga
Products Company, A Partnership, by and through
Saga Petroleum U.S., Inc., a partner,
Defendants- Appellees.
L.O. CROSBY, III, Plaintiff-Appellant,
v.
SAGA PETROLEUM U.S., INC., Scurlock Oil Company, and Saga
Products Company, A Partnership, by and through
Saga Petroleum U.S., Inc., a partner,
Defendants- Appellees.
 No. 84-4434.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 2, 1985.
 
 Kenneth I. Franks, Kenneth I. Franks, Glen Gates Taylor, Jackson, Miss., Wallace R. Gunn, Hattiesburg, Miss., for plaintiff-appellant.
 Brunini, Grantham, Grower & Hewes, Jefferson D. Stewart, John M. Grower, Jackson, Miss., T. Brooke Farnsworth, W. Frances Moore, Houston, Tex., Easterling & Varnado, S. Wayne Easterling, Hattiesburg, Miss., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Before THORNBERRY, RUBIN, and HIGGINBOTHAM, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 Plaintiffs-appellants Crosby-Mississippi Resources, Ltd., Stewart Gammill, and L.O. Crosby, working interest owners in certain gas wells, brought this consolidated diversity action against defendants-appellees Saga Petroleum U.S., Inc. (Saga), the operator of those wells, Scurlock Oil Company, and Saga Products Company (Saga Products), alleging inter alia breach of contract, breach of fiduciary duty, and unjust enrichment. The district court granted summary judgment in favor of the appellees, and we affirm.
 
 FACTS
 
 2
 The appellants are non-operating working interest owners in five gas wells located in the Waveland Field, Hancock County, Mississippi. Saga was the operator of those wells pursuant to operating agreements executed by each of the appellants. The resolution of this case turns on Section 13 of those agreements:
 
 
 3
 In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and condensate produced from the Unit Area, Operator shall have the right, subject to revocation at will by the party owning it, but not the obligation to purchase such oil and condensate or sell it to others for the time being, at not less than the market price prevailing in the area, which shall in no event be less than the price which Operator receives for its portion of the oil and condensate produced from the Unit Area. Any such sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its rights to take in kind or separately dispose of its share of oil and condensate not previously delivered to a purchaser.
 
 
 4
 (emphasis added).
 
 
 5
 Although the appellants made arrangements to sell separately their proportionate shares of the natural gas produced from the wells, they made no arrangements to sell their shares of the condensate produced. Saga saw a potential profit in refining the price-regulated condensate into refined petroleum products, which were not price-regulated, and formed a general partnership, Saga Products,[1] to purchase the condensate from the wells. As managing partner of Saga Products, Saga then negotiated with Scurlock Oil Company to transport the condensate to a refinery in Louisiana. Scurlock, however, informed Saga that it could not transport the condensate across state lines unless it had title to it. Accordingly, Saga, as operator, entered into an agreement to sell the Waveland Field condensate (including appellants' share) to Scurlock. Simultaneously, Saga, as managing partner of Saga Products, entered into a separate agreement to purchase the condensate from Scurlock at the Louisiana refinery. The price to be paid by Saga Products was the wellhead price, plus a gathering and transportation fee. Saga Products contracted with the refinery to refine the condensate into petroleum products. It then sold the refined products for the highest price obtainable.
 
 
 6
 Between June 1979 and April 1980, Saga credited appellants with wellhead sales of the condensate at the maximum price allowed by the Department of Energy (DOE), or with sales at prices equal to or greater than the market prices prevailing in the Field. The price Saga Products received for the refined condensate, however, was generally greater than the price credited to the appellants.
 
 
 7
 In consolidated actions the appellants brought suit against Saga, Saga Products, and Scurlock. In Counts I and II of their complaint the appellants contended that Saga breached its operating agreements by crediting appellants with the wellhead sales price of condensate rather than the price Saga Products received for the refined products. In Count III the appellants alleged that Saga breached a fiduciary duty owed to the appellants. In Count IV the appellants sought recovery on an unjust enrichment theory, and in Count V they sought punitive damages. Appellants also made claims relating to the detention of the proceeds of the sales, and these claims remain in the district court.
 
 
 8
 The district court granted summary judgment in favor of the appellees on Counts I-V. We affirm.
 
 I. The Operating Agreements
 
 9
 The appellants' central contention is that Saga breached Section 13 of the operating agreements by accounting for the working interest owners' share of condensate at the price paid by Scurlock at the wellhead rather than at the price Saga Products received for the refined petroleum products. They argue that the sale to Scurlock and subsequent repurchase by Saga Products were sham transactions concocted by Saga to avoid its obligation to account to the appellants at not less than the price it received for its portion of the condensate. In essence, the appellants' contention is that under Section 13 of the operating agreements they are entitled to benefit from Saga's efforts to refine the condensate.
 
 
 10
 The appellants have expended much energy in attempting to show that the wellhead sales to Scurlock and subsequent purchases by Saga Products were sham transactions and that, therefore, the first true sale occurred when Saga Products sold the refined condensate.[2] In light of the clear language of the contract, however, the appellants' attempts are somewhat misdirected. Unless the appellants can first show that they received less than they were entitled to under Section 13, it matters not to the resolution of this case whether the transactions initiated by Saga were the worst of shams. If the "sham" transactions inflicted no injury on appellants, they have no cause to complain.
 
 
 11
 The crucial language of Section 13 provides that Saga shall have the right "to purchase such oil and condensate or sell it to others ... at not less than the market price prevailing in the area, which shall in no event be less than the price which [Saga] receives for its portion of the oil and condensate." Although the district court did consider at length the legitimacy of the sale to Scurlock, the crux of its opinion is its statement that "[t]here is nothing in the language in Section 13 which indicates plaintiffs have a right to receive 'profits' from the sale of 'refined petroleum products.' " With this we agree.
 
 
 12
 As the district court noted, Section 13 speaks only of oil and condensate. "Condensate" is generally recognized to mean liquid hydrocarbons which are recovered at the wellhead. Because of its similarity to light crude oil in both composition and use, condensate has been regulated as "crude oil" and not as "refined petroleum products" by the DOE. See Mobile Oil Corp. v. Federal Energy Administration, 566 F.2d 87 (TECA 1977). Similarly, the Mississippi Code does not define "product" to include condensate, but lists condensate as one of the raw materials, from which "product" may be made. Miss.Code Ann. Sec. 53-1-3(i) (Supp.1984). Nevertheless, despite this clear distinction between condensate and refined petroleum products, the appellants contend that they are entitled to share in the sale of refined products. This the contract will not allow. We must agree with the district court that had the parties intended that the working interest owners be compensated at the price for refined products they would have drafted the contract accordingly. But, the contract refers only to condensate.
 
 
 13
 We can see then that it does not matter whether the sale to and repurchase from Scurlock were sham transactions. The appellants peg their case on Saga Products' sale of the condensate after it was refined into products, but that is not a sale of condensate, that is a sale of products. It is possible that through all of Saga's machinations there was never a true sale of condensate. That, however, does not entitle the appellants to share in the sale of something other than condensate.
 
 
 14
 Moreover, it is undisputed that under Section 13 Saga would have been within its rights to purchase the appellants' condensate at the market price at the wellhead, arrange to refine it, and sell the refined product for a profit while compensating the appellants at the wellhead price. This scenario would not be an inapt construction of the events in this case. Indeed, in arguing their sham transaction theory the appellants have asserted that the wellhead purchase by Scurlock was no more than Saga purchasing the condensate with its own money, which, of course, it was entitled to do. Similarly, the series of transactions in question could be construed as Saga taking the condensate from the field and selling it to Saga Products at the market price of condensate, which again it was entitled to do under Section 13.
 
 
 15
 Our somewhat technical construction of the contract, based on the inclusion of the word "condensate" and omission of any reference to products, is buttressed by the more general principle that it would be unfair to allow the appellants to share in the benefit of Saga's refining the condensate without forcing them to share in the concomitant risk. Saga undertook a business venture (i.e. transporting and refining the condensate) that it was under no obligation to the appellants to undertake. It applied its business and organizational skills and exposed itself to not insignificant risk. Without a specific contractual provision to the contrary, the appellants should not be allowed to benefit from Saga's industry.
 
 
 16
 This conclusion is well supported in the case law. For example, in Phillips Petroleum Co. v. Record, 146 F.2d 485, 486 (5th Cir.1944), where a gas lease required the lessees to pay lessors a royalty of one-eighth payable at the prevailing market rate for gas, we held that "[t]he [plaintiff's] argument ... that the provision for payment to them of one-eighth of the gross proceeds of the gas from their well entitled them to receive not one-eighth of the market value of the gas received in exchange but one-eighth of the market value of the products manufactured from that gas, will not do at all." Similarly, in Armstrong v. Skelly Oil Co., 55 F.2d 1066, 1067 (5th Cir.1932), where the lessees erected a plant to extract gasoline from wet gas we stated:
 
 
 17
 Appellees were under no obligation to erect a plant to treat this gas. When they did so they were entitled to deal with the lessor the same as a stranger would have done. Had the gas been sold to an extracting plant, the lessee, under the universal custom of the trade, would have received returns identically the same as those made by appellees.
 
 
 18
 Likewise on point is Danciger Oil & Refineries v. Hamill Drilling Co., 141 Tex. 153, 171 S.W.2d 321, 323 (1943):
 
 
 19
 No provision was made for the processing of the products, nor for the payments to be made out of the processed products. On the contrary, the payments were to be made out of the products named.... The payments were to be made out of 'gas ... if, as and when produced,' and not out of its value after it had been processed into a product of higher value.
 
 
 20
 More recently, where the lease provided that royalty payments were to be based on all gas marketed at the wellhead, or if marketed off the premises, on the market value at the wellhead, the Tenth Circuit held:
 
 
 21
 The fact that appellee did repurchase and remove the liquifiable hydrocarbons jointly with other products, and did manufacture valuable products, is of no consequence here. The appellants, by choice, tied their royalty payments to the wellhead market value of the gas.... Appellants are precluded from contending that they are entitled to royalties on the end products after extraction.
 
 
 22
 Barby v. Cabot Corporation, 465 F.2d 11, 15 (10th Cir.1972). Just as in Barby, the appellants here tied their payments to condensate. Had they wished to share in the sale of refined products they should have insisted on appropriate language in the contract. We will not now rewrite their contract for them.
 
 
 23
 It might be argued that government regulation of wellhead condensate prices was unforeseen at the time of the contract negotiations and acted to create for Saga an opportunity to take advantage of the difference in price between condensate and refined products. That was a risk, however, that the appellants accepted implicitly when they tied their payments to condensate and not refined products. Moreover, we note that nothing stood to prevent the appellants from doing precisely as Saga has done--taking their condensate in kind and profiting from a transportation and refining arrangement.
 
 
 24
 The appellants received for their condensate at least the market price prevailing in the field, and, under Section 13 of the operating agreements and the facts of this case, that, and no more, was their due.
 
 II. No Breach of Fiduciary Duty
 
 25
 The appellants contend that their relationship with Saga was one of joint venture and that Saga, therefore, had a fiduciary duty to them to share in the profits of its efforts in refining the condensate. We disagree. For a joint venture to arise in Mississippi, "[t]here must be a joint proprietary interest and right of mutual control." Sample v. Romine, 193 Miss. 706, 8 So.2d 257, 260, modified, 10 So.2d 347 (Miss.1942). There must also be an agreement, whether express or implied, to share in the profits of the venture. Id. The district court held that the whole tenor of the operating agreement, as well as the explicit contractual language and undisputed facts, indicated that the parties did not intend to share profits from the marketing of refined petroleum products. We agree. See Part I supra. Even if a joint venture were established, the duties pertaining thereto would not extend beyond a reasonable interpretation of the operating agreements.[3]
 
 
 26
 Nor are we convinced that Saga breached any duty of good faith, whether arising from the UCC or otherwise. Saga fully performed its obligations under the contract and we know of no principle of law that would require more under the facts of this case.
 
 III. Unjust Enrichment
 
 27
 Finally, the appellants argue that the appellees were unjustly enriched by the series of transactions culminating in the sale of refined products. This contention, however, is wholly insupportable. Through the application of their own skills and efforts the appellees profited from a business venture. Moreover, the appellants got all that they bargained for. Indeed, to require appellees to share the profits of their labor with appellants, who have expended not the least amount of energy, would be truly unjust. Although Saga could have given the appellants the opportunity to join in the refining arrangement, neither the contract nor the law obligated it to do so.
 
 
 28
 For the aforementioned reasons the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Joining Saga in the partnership were Varibus Corporation and Marshall R. Young Oil Company, who were working interest owners in the wells. The appellants were not invited to join the partnership
 
 
 [2]
 In this regard the appellants rely rather heavily on Piney Woods Country Life School v. Shell Oil Co., 726 F.2d 225 (5th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1868, 85 L.Ed.2d 161 (1985). Although we think that Piney Woods lends only modest support to the appellants' position, we need not discuss it further since we have determined that the resolution of this appeal does not depend upon whether the wellhead sale to Scurlock was bona fide
 
 
 [3]
 "While perhaps no exact definition of a joint adventure can be given, nor can a general rule be laid down by which the question as to what amounts to be a joint adventure can be answered, the answer in each case [depends] on the terms of the agreement, the nature of the undertaking and other facts...." Sample, 8 So.2d at 260 (emphasis added)